1  **JOHNSON FISTEL, LLP**
    FRANK J. JOHNSON (SBN 174882)
2  FrankJ@johnsonfistel.com
    BRETT M. MIDDLETON (SBN 199427)
3  BrettM@johnsonfistel.com
    JOHN J. O'BRIEN (SBN 253392)
4  JohnO@johnsonfistel.com
    655 West Broadway, Suite 1400
5  San Diego, CA 92101
    Telephone: (619) 230-0063
6  Facsimile: (619) 255-1856

7  *Counsel for Plaintiff Alison Sherman*

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10  ALISON SHERMAN, derivatively on behalf      Case No.: 3:20-cv-5255
     of ORACLE CORPORATION, a Delaware
11  corporation, and ORACLE AMERICA, INC.,      **VERIFIED SHAREHOLDER**
     a Delaware corporation,                     **DERIVATIVE COMPLAINT FOR**
12                                                **BREACH OF FIDUCIARY DUTY,**
                  Plaintiff,                      **WASTE OF CORPORATE ASSETS,**
13                                                **UNJUST ENRICHMENT, AND**
             v.                                   **VIOLATIONS OF FEDERAL**
14                                                **SECURITIES LAWS**
     LAWRENCE J. ELLISON, SAFRA A. CATZ,
15  JEFFREY O. HENLEY, JEFFREY S. BERG,
     MICHAEL J. BOSKIN, BRUCE R. CHIZEN,
16  GEORGE H. CONRADES, RONA A.
     FAIRHEAD, RENÉE J. JAMES, CHARLES          **JURY TRIAL DEMANDED**
17  (WICK) MOORMAN IV, LEON E.
     PANETTA, WILLIAM G. PARRETT,
18  NAOMI O. SELIGMAN, and VISHAL
     SIKKA,
19
                  Defendants,
20
             -and-
21
     ORACLE CORPORATION, a Delaware
22  corporation, and ORACLE AMERICA, INC. a
     Delaware corporation,
23
                  Nominal Defendants.
24

25

26

27

28

Plaintiff Alison Sherman ("Plaintiff"), by her attorneys, submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Violations of Federal Securities Laws, derivatively for the benefit of Nominal Defendants Oracle Corporation and Oracle America, Inc. (collectively, "Oracle" or "the Company").

Plaintiff bases her allegations on personal knowledge and, as to all other matters outside her personal knowledge, upon information and belief based on the investigation of counsel, which includes, without limitation, review and analysis of: (i) Oracle's public filings with the United States Securities and Exchange Commission (SEC), including its proxy statements for annual shareholder meetings—particularly, the September 27, 2019 Proxy Statement ("the 2019 Proxy Statement"); (ii) Oracle's press releases; (iii) analyst, industry, and media reports concerning Oracle; (iv) employment discrimination actions in federal and state court against Oracle, including *OFCCP v. Oracle America, Inc.*, Case No: 2017-OFC-00006 (Dep't of Labor A.L.J.) (filed Jan. 17, 2017) and *Jewett v. Oracle America, Inc.*, 17-CIV-02669, (Cal. Super. Ct., San Mateo Cnty.) (filed June 16, 2017) (the "Employment Discrimination Actions"); and (v) Oracle's production of documents to Plaintiff in response to her shareholder books and records demand, pursuant to Title 8, Section 220 of Delaware General Corporation Law ("Section 220").

## I.      INTRODUCTION

1.      For the past three years, as Oracle faces the Employment Discrimination Actions, Congressional ire, and continuous allegations of employment discrimination and pay disparities, the shareholders have sought transparency and answers.    In hopes of achieving such transparency into and answers regarding the Company's employment practices, as is becoming common for high-profile companies like Oracle, the shareholders proposed a pay equity report each year.

2.      Prior to filing this derivative action, Plaintiff propounded a Section 220 demand on Oracle's Board of Directors ("the Board").   Oracle's document production ("the 220 Production") establishes that ███████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5 3. In approving and distributing the false and misleading opposition statement in

6 the 2019 Proxy Statement, the Board breached its fiduciary duties to Oracle, violated its duties

7 pursuant to committee charters, unjustly enriched themselves, wasted corporate assets, and

8 violated federal securities laws.

9 4. Oracle is a company of over 136,000 employees in locations across the United

10 States and throughout the world, so legal exposure is limitless if the Board continues its

11 historical issuance of misleading proxy statements.

12 5. Among other things, Plaintiff brings this action for damages to repair the harm

13 the Board has caused Oracle, and for several forms of injunctive relief to prevent further harm

14 to Oracle, including Court orders for: (i) appropriate corrective disclosures with respect to the

15 2019 Proxy Statement; (ii) preventing a misleading 2020 proxy statement; and (iii) mandating

16 shareholder votes on proposals for improved corporate governance.

17 **II.** **JURISDICTION AND VENUE**

18 6. This Court has subject matter jurisdiction due to federal question and

19 supplemental jurisdiction.  Pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act

20 (15 U.S.C. § 78aa), this Court has jurisdiction over the claims asserted herein for violations of

21 § 14(a) of the Exchange Act, SEC regulation 14a-9 promulgated thereunder, and the claims for

22 breach fiduciary duty premised upon duties imposed and defined by the federal securities laws,

23 rules, regulations, and federal substantive corporate law.

24 7. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over

25 all other claims that are so related to claims in this action within the Court's original jurisdiction

26 as they form part of the same case or controversy under Article III of the United States

27 Constitution.

28

2

8.     This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b), (c), and (d).  Oracle maintains its headquarters in Redwood City, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.  INTRADISTRICT ASSIGNMENT

10.     Pursuant to Local Rule 3-5(b), Plaintiff requests that the clerk assign this action to the San Francisco Division of this District as, pursuant to Local Rule 3-2(c), a substantial part of the events or conduct giving rise to the claims herein occurred in the San Mateo County, California.

## IV.  PARTIES

### A.  Plaintiff

11.     Plaintiff Alison Sherman is a current shareholder of Oracle and has continuously owned such shares throughout the Relevant Period.  Plaintiff will hold Oracle shares continuously throughout the pendency of this action.  Plaintiff brings this action derivatively in

the right of and for the benefit of the Company.  Plaintiff will fairly and adequately represent the interests of Oracle and its shareholders in enforcing the rights of the Company.

**B.**   <u>**Nominal Defendants**</u>

12.    Nominal Defendant Oracle Corporation is incorporated under the laws of Delaware with its principal executive offices located in Redwood City, California.  Oracle Corporation's wholly owned subsidiary is Oracle America, Inc.

13.    Oracle America, Inc. is the issuer of the common stock sold in the Offering. Oracle America, Inc's common stock trades on the New York Stock Exchange under the symbol "ORCL."  As of June 16, 2020, Oracle America, Inc. had over 3 billion shares of common stock outstanding.

**C.**   <u>**Individual Defendants**</u>

14.    Defendant Lawrence J. Ellison ("Ellison") is the chairman of the board of Oracle Corporation and its chief technology officer ("CTO").  Ellison founded the Company in the 1970s, served as chief executive officer ("CEO") until 2014, and has been on the Board since 1977. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.  In 2019, Oracle compensated Ellison approximately $1 billion in stock dividends.

15.    Defendant Safra A. Catz ("Catz") has been CEO of Oracle Corporation since 2014 and a board member since 2001.  She previously served as president of Oracle and as its chief financial officer ("CFO").  Catz has served Oracle in various roles since 1999. ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and is therefore liable under the Securities Act for the untrue and

1  misleading statements and omissions therein.  In 2019, Oracle compensated Catz approximately

2  $966,000 in wages and $22 million in stock dividends.

3      16.    Defendant Jeffrey O. Henley ("Henley") is vice chairman of Oracle Corporation

4  and on its Executive Management Committee.  Henley was the Company's CFO and an

5  executive vice president from 1991 to 2004 and has been a board member since 1995.  Henley

6  was chairman of the Oracle board from 2004 until 2014. ███████████████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████████ ███ ████ ████████ ████████ ███ ████ ████████ ████████

9  ███████████████████████████████████████████████████████ and is

10  therefore liable under the Securities Act for the untrue and misleading statements and omissions

11  therein.  In 2019, Oracle compensated Henley approximately $4.8 million in stock dividends.

12      17.    Defendant Jeffrey S. Berg ("Berg") has been an Oracle board member

13  since 1997.  From May 2003 to March 2012, Berg was a Senior Sales Director of Oracle Cloud

14  Management Services. ████████████████████████████████████████████████████

15  ████████████████████████ ████████████████████████████████████████████

16  ████████████████████████████████████████████████ ████████████████████

17  ████████████████████████████ and is therefore liable under the Securities

18  Act for the untrue and misleading statements and omissions therein.  In 2019, Oracle

19  compensated Berg approximately $579,000 in cash and stock awards.

20      18.    Defendant Michael J. Boskin ("Boskin") has been an Oracle board member

21  since 1994.  He attended the board meeting wherein the Board authorized the 2019 Proxy

22  Statement. ██████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ██████████████████████████████ and is therefore liable under the Securities Act for the

25  untrue and misleading statements and omissions therein.  In 2019, Oracle compensated Boskin

26  approximately $691,000 in cash and stock awards.

27      19.    Defendant Bruce R. Chizen ("Chizen") has been an Oracle board member

28  since 2008. ████████████████████████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  ███████████████ ████████████████████████████████████████

2  ████████████████████████████████████████████████████████

3  ████████████████████████████ and is therefore liable under the Securities Act for the

4  untrue and misleading statements and omissions therein.  In 2019, Oracle compensated Chizen

5  approximately $564,000 in cash and stock awards.

6      20.    Defendant George H. Conrades ("Conrades") has been an Oracle board member

7  since 2008.  ████████████████████████████████████████████

8  ███████████████ ████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████ and is therefore liable under the Securities Act for the

11 untrue and misleading statements and omissions therein.  In 2019, Oracle compensated Conrades

12 approximately $706,000 in cash and stock awards.

13     21.    Defendant Rona A. Fairhead ("Fairhead") joined the Board in 2019.  For fiscal

14 year 2020, Oracle compensated Fairhead approximately $377,000 in cash and stock awards.

15     22.    Defendant Renée J. James ("James") has been an Oracle board member

16 since 2015.  ██████████████████████████████████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████████████████████████████████ ██████████████

19 ████████████████████████████ and is therefore liable under the Securities Act for the

20 untrue and misleading statements and omissions therein.  In 2019, Oracle compensated James

21 approximately $445,000 in cash and stock awards

22     23.    Defendant Charles (Wick) Moorman IV ("Moorman") has been an Oracle board

23 member since 2018.  ████████████████████████████████████████

24 █████████████████████████ ██████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████ and is therefore liable under the

27 Securities Act for the untrue and misleading statements and omissions therein.  In 2019, Oracle

28 compensated Moorman approximately $466,000 in cash and stock awards.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    24.    Defendant Leon E. Panetta ("Panetta") has been an Oracle board member
2    since 2015. ████████████████████████████████████████████████
3    ████████████████████████████████████████████████████████████
4    ████████████████████████████████████████████████████████████
5    ████████████████████████████████    and is therefore liable under the Securities Act for the
6    untrue and misleading statements and omissions therein.  In 2019, Oracle compensated Panetta
7    approximately $485,000 in cash and stock awards.
8    25.    Defendant William G. Parrett ("Parrett") has been an Oracle board member
9    since 2018. ████████████████████████████████████████████████
10   ████████████████████████████████████████████████████████████
11   ████████████████████████████████████████████████████████████
12   ████████████████████████████████    and is therefore liable under the Securities Act for the
13   untrue and misleading statements and omissions therein.  In 2019, Oracle compensated Parrett
14   approximately $466,000 in cash and stock awards.
15   26.    Defendant Naomi O. Seligman ("Seligman") has been an Oracle board member
16   since 2005. ████████████████████████████████████████████████
17   ████████████████████████████████████████████████████████████
18   ████████████████████████████████████████████████████████████
19   ████████████████████████████████    and is therefore liable under the Securities Act for the
20   untrue and misleading statements and omissions therein.  In 2019, Oracle compensated Seligman
21   approximately $470,000 in cash and stock awards.
22   27.    Defendant Vishal Sikka ("Sikka") has been an Oracle board member since 2019.
23   For fiscal year 2020, Oracle compensated Sikka approximately $189,000 in cash and stock
24   awards.
25   28.    The defendants referenced in Paragraphs 14 to 27 above are referred to herein as
26   the "Individual Defendants."

7

## V.    ORACLE'S BUSINESS BACKGROUND

29.    Headquartered in Redwood City, CA, Oracle is an American multinational computer technology company that designs, manufactures, and markets network computing infrastructure solutions.  The Company offers data storage products, cloud platform, databases, microprocessors, software desktop systems, developer software, infrastructure management software, and other related products and solutions.

30.    Oracle operates in multiple markets including, without limitation, communications, construction and engineering, financial services, food and beverages, health sciences, hospitality, retail, utilities, education, and government.

31.    Oracle employs approximately 136,000 individuals, including over 7,000 in Redwood City alone.  It has 15 offices in California, operates in 29 states, and operates in 55 countries.

## VI.    ORACLE'S HISTORY OF EMPLOYMENT DISCRIMINATION

32.    For many years, Oracle has either willfully engaged in employment discrimination or negligently operated in a fashion that produces disparate employment hiring and compensation data.  This employment data has resulted in the filing of the Employment Discrimination Actions, in addition to two Congressional rebukes, which, in turn, resulted in the Oracle shareholders proposing pay equity reports in search of answers.

### A.    The Ongoing Department of Labor Lawsuit

33.    In 2014, the United States Department of Labor ("DOL") began an investigation into Oracle's employment practices.  After Oracle refused to provide the DOL with relevant employment data and records, the DOL commenced an employment discrimination action against Oracle.  *See OFCCP v. Oracle America, Inc.*, Case No: 2017-OFC-00006 (Dep't of Labor A.L.J.) (filed Jan. 17, 2017) ("the DOL Lawsuit").  The DOL is concerned with Oracle's employment discrimination because, as a government contractor, Oracle's employment and compensation practices prohibit discrimination.

34.    In its lawsuit, the DOL alleges that Oracle pays its white male workers more than females, Black or African American individuals, and Asians for the same jobs.  Further, the

8

DOL alleges that Oracle favors Asian workers over non-Asian workers because the Company can pay these employees less than non-Asian employees.

35.     In January 2019, the DOL filed a Second Amended Complaint ("SAC") against Oracle.  In support of its motion to file leave to amend, the government explained that Oracle's employment data—at least what Oracle produced—confirms "stark patterns of discrimination began in at least 2013 and continued well past the [DOL's] review period . . . ."  According to the DOL, Oracle's discriminatory practices affect thousands of employees just at its Redwood City headquarters.

36.     The SAC details how Oracle discriminates against female, Black or African American, and Asian employees in compensation.  The DOL alleges Oracle relies on prior salary in setting initial pay, and/or channels females, Black or African American, and Asian employees into lower-paying positions.  The government further alleges that the depression of wages for these individuals resulted in more than $400 million in wage losses.

37.     Moreover, according to the DOL, Oracle's university hiring practices are designed to favor Asians.  This favoritism is so extreme that of approximately 500 university hires, from 2013 to 2016, Oracle hired 450 (or 90%) Asians.  The DOL claims Oracle goes even further, preferring to hire visa-holding Asian university graduates, who are dependent on Oracle to work in the United States, leading to their wage suppression.

38.     According to the DOL, between 2013 and 2016, Oracle hired only six Black or African American college graduates into particular job groups.  By comparison, in 2016, Oracle hired *zero* Black or African American college graduates in particular job groups.   In January 2019, after prevailing in a public records request lawsuit, *Reveal News* corroborated the DOL's allegations, and reported that records establish Oracle's workforce, as of 2015, was 90% white or Asian.  The DOL further alleges that, of the Black or African American and Asian employees it did hire, even when they have experience, they have pay disparities as high as 25% less than their peers.

39.     Instead of the remedying the discrimination and/or settling with the DOL, in November 2019, the Board sued the DOL, alleging its practices violate the U.S. Constitution, in

1    the United States District Court for the District of Columbia.  *See Oracle America, Inc. v. U.S.*

2    *Dep't of Labor,* Case No. 1:19-cv-03574-APM (D.D.C.) (filed Nov. 27, 2019).  Currently, there

3    are motions for summary judgment pending.  *Bloomberg Law* reports that Oracle's lawsuit

4    against the DOL is believed to "ha[ve] no foundation," but reflects Oracle's "scorched earth"

5    litigation tactics.

6    **B.      The Ongoing Employment Class Action Lawsuit**

7            40.     On June 16, 2017, prior and current Oracle female employees filed a class action

8    lawsuit against Oracle for employment discrimination, which remains ongoing.  *See Jewett v.*

9    *Oracle America, Inc.*, 17-CIV-02669 (Cal. Super. Ct., San Mateo Cnty.) (filed June 16, 2017)

10   ("the Employment Class Action").  On September 7, 2018, the plaintiffs filed a fourth amended

11   complaint.  Plaintiffs allege, among other things, Oracle paid them $13,000 less than men for

12   substantially similar work.

13           41.     On April 29, 2020, the San Mateo Superior Court granted class certification to

14   4,100 women in the Employment Class Action.  The Court relied on a plaintiff-commissioned

15   report finding women at Oracle earned 13% less than their male counterparts.  UC-Irvine

16   economics professor David Neumark performed the study that supported this report.  The Court

17   found this study and resulting report credible, ruling that "Professor Neumark had a reasonable

18   basis for his opinions that education, years of prior job experience, tenure at Oracle, and

19   performance review scores do not explain the gender pay gap faced by women in the same job

20   code as men."

21   **C.      The Ongoing Congressional Concerns**

22           42.     On November 22, 2019, at the behest of the Congressional Black Caucus and

23   House Technology Accountability caucus, the United States Congress sent a letter to the Board.

24   The letter sharply stated:

25           The fact that African Americans make up 13% and Asian Americans make up
             5.6% of the U.S. population but 0% of Oracle's board and leadership team is
26           inexcusable. . . .  As a company that has expressed a commitment to diversity
             and rejected claims of intentional discrimination, you should recognize the
27           optics of Oracle working doggedly to sell software and technology systems to
             businesses and congressional districts, historically black colleges and
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

universities and minority serving institutions, and communities of color — but not work to remedy the lack of diversity on your board.

43.    This marked the second time in 2019 that Oracle attracted congressional scrutiny for its employment practices.  Earlier, in January 2019, the caucuses wrote to the Company expressing dismay about the DOL allegations.

## VII.    THE DEFENDANTS' DUTIES TO ORACLE

44.    The Defendants owe Oracle fiduciary duties, as well as duties pursuant to the committee charters and the Oracle Code of Ethics and Business Conduct ("the Oracle Code").

### A.    Defendants' Fiduciary Duties

45.    As officers and/or directors of Oracle, and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its shareholders the fiduciary duties of care and loyalty, including the subsidiary duties of good faith, oversight, and disclosure.  They were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and an equitable manner.  The duty of care requires informed, deliberative decision-making based on all material information reasonably available.  The duty of loyalty requires acting (including deciding not to act) on a disinterested and independent basis, in good faith, with an honest belief that the action is in the best interests of the company and its shareholders.

46.    To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Oracle.  They were, and are, required to, among other things:

(a)    use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner;

(b)    exercise good faith, fair dealing, and diligence in the administration of the affairs of the Company;

(c)    ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws and government rules and regulations);

11

(d)     neither violate nor knowingly permit any officer, director, or employee of Oracle to violate any applicable laws, rules, or regulations;

(e)     remain informed as to the status of Oracle's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

(f)     maintain systematic and accurate records and reports of the business and affairs of Oracle and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain an adequate, functioning system of internal controls, such that the affairs and operations of Oracle are conducted in accordance with all applicable laws, rules, and regulations;

(h)     avoid wasting the Company's assets and maximize the value of the Company's stock;

(i)     truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company; and

(j)     act in furtherance of the best interests of Oracle and not in furtherance of their personal interests.

47.     Moreover, because of their positions, the Individual Defendants directly and/or indirectly exercise control over Oracle, and, in doing so, each have knowledge of material, nonpublic information regarding the Company.

**B.     <u>Additional Duties of Committee Defendants</u>**

48.     In addition to the above duties, the Finance & Audit Committee's primary functions include, without limitation, oversight of management's conduct of the Company's financial accounting and reporting processes, the Company's compliance with legal and regulatory requirements, and the performance of the Company's internet audit function. Defendants Berg, Boskin, Chizen, and Parrett ("the Finance & Audit Committee Defendants")

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

serve on the Finance & Audit Committee and, pursuant to the committee charter, owed specific duties to Oracle, including, without limitation, to:

> (a)    appoint, retain, and terminate independent accountants, oversee their work, and ensure the fullness and accuracy of the Company's financial statements;

> (b)    review and consider major issues regarding and changes to the Company's auditing and accounting principles;

> (c)    discuss the Company's policies regarding risk assessment and management;

> (d)    review and evaluate the Company's internal auditing and risk assessment therefrom; and

> (e)    oversee the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Oracle Code.

49.    Oracle's Governance Committee's primary functions include, without limitation, leading the Board in a review of the performance of the Board and its committees, and reviewing and reassessing the Company's corporate governance policies and procedures. Defendants Berg, Chizen, and Panetta ("the Governance Committee Defendants") serve on the Governance Committee and, pursuant to the committee charter, owed and owe specific duties to Oracle, including, without limitation, to hiring legal, accounting, financial, and other advisors.

50.    Oracle's Compensation Committee's primary functions include, without limitation, conducting an annual risk oversight of Oracle's compensation practices, policies, and programs. Defendants Conrades, Seligman, Moorman, and Panetta ("the Compensation Committee Defendants") serve on the Compensation Committee and, pursuant to the committee charter, owed and owe specific duties to Oracle, including, without limitation, "annually assess[ing] the risks associated with Oracle's compensation practices, policies and programs applicable to employees to determine whether the risks arising from such practices, policies and programs are appropriate or reasonably likely to have a material adverse effect on Oracle," and retaining or obtaining the advice of a compensation consultant.

**C.**     **Defendants' Duties Pursuant to Oracle's Corporate Governance Principles**

Oracle's Corporate Governance Guidelines ("the Guidelines") provide that:

> The Board is also responsible for overseeing management's efforts to assess and manage material risks and for reviewing options for risk mitigation.  The Board reserves oversight of the major risks facing Oracle and may delegate risk oversight responsibility to committees of the Board.

51.     The Guidelines also mandate that "[a]ll directors are expected to comply with the Oracle Code."  In the preface the Oracle Code, defendants Ellison, Catz, and Hurd proclaim, "[Oracle champions] ethical business values that go well beyond minimum legal requirements."

52.     The Oracle Code establishes its core values, including, but not limited to, mutual respect [whereby Oracle employees consistently treat individuals with respect and dignity], fairness [whereby Oracle employees commit to dealing fairly with one another], and compliance [whereby Oracle employees comply with all laws, regulations, and Oracle policies that govern Oracle's business].  In fact, the Oracle Code proclaims that Oracle managers "must be leaders in compliance."

53.     Furthermore, the Oracle Code establishes the following principles, which the Individual Defendants must uphold:

(a)     Oracle's goal is to deal fairly and equitably with each employee;

(b)     Oracle affirms the principle of equal employment opportunity without regard to any protected characteristic, including, but not limited to, race, national origin, color, gender, and national origin/ancestry;

(c)     Oracle affirms the principle of freedom from discrimination in all aspects of the employment relationship from recruitment and hiring, through performance evaluations, compensation, and promotions, to the end of the employment relationship; and

(d)     Oracle practices and promotes such employment policies in all locations as appropriate under the law wherever it operates.

54.     In additional affirmation of its purported anti-employment discrimination policies, the Oracle Code claims:

14

We base personnel actions strictly on individual ability, performance, experience, and company need.  We avoid actions influenced by personal relationships and discriminatory practices of any kind.  Our goal is to compensate personnel — with wages, salaries, and other benefits — in relation to their responsibilities, performance, and experience.  Oracle is also committed to adhering to wage, hour, and minimum-age guidelines provided by applicable laws.  We strive to structure the content of jobs so that work provides personal satisfaction and challenge.

55.     Acknowledging that a failure to abide by anti-discrimination laws exposes Oracle to major risk, the Company admits in the Oracle Code:

Oracle is committed to being a world-class company that enjoys the confidence of thousands of entities and individuals around the globe.  To continue to do so, we need to understand whether problems exist with our personnel, business, or operations so that we can resolve issues promptly, take corrective action, or make needed improvements.

## VIII.   THE DEFENDANTS BREACHED THEIR DUTIES TO ORACLE AND VIOLATED FEDERAL SECURITIES LAWS

56.     For the 2019 Annual Meeting of Shareholders, Oracle's shareholders sought answers in the light of the Employment Discrimination Actions, the repeated Congressional disapproval, and the ongoing employment discrimination and pay gap allegations against the Company.  To foster transparency for the benefit of the Company, the shareholders—for the third year in a row—proposed that Oracle prepare a pay equity report:

Shareholders request Oracle prepare a report . . . (at reasonable cost, omitting proprietary and confidential information), identifying whether a gender pay gap exists among its employees, and if so, outline the steps being taken to reduce the gap. The Organization for Economic Cooperation and Development has defined the gender pay gap as the difference between male and female earnings expressed as a percentage of male earnings.

57.     As circumstantially evidenced by the 220 Production, in opposition to the 2019 proposal, the Board and its committees ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ This action in 2019 breached the Board's fiduciary and other duties, the committee charter duties, violated the Oracle Code, and violated federal securities laws.

1

**A.**   **The Defendants' Historical Dismissal of Pay Equity Transparency**

2    58.    The Board and its committees opposed identical shareholder proposals for pay

3    equity reports in 2017 and 2018.

4    59.    For instance, ████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████

6    ████████████████    Bates Nos. ORCL-220_000454.  As reflected in the minutes and resolutions,

7    ████████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████

9    ████████████    Bates Nos. ORCL-220_000460-461, 470; *see also* Board Resolutions [ORCL-

10   220_000469-470]. ████████████████████████████████████████████

11   ████████████████████████████████████████████████████    Bates Nos. ORCL-

12   220_000460. ████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████████

14   ████████████    Bates Nos. ORCL-220_000460. ████████████████████████

15   ████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████    Bates Nos. ORCL-

19   220_000461.

20   60.    ████████████████████████████████████████████, in the first

21   episode of what are now annual feel-good generalizations, on September 28, 2017, the Board

22   issued its misleading opposition to the shareholders' 2017 proposal for a pay equity report,

23   representing, among other things:

24       Oracle believes that a diverse workforce is critical to driving creativity,
         innovation and growth. We make every effort to attract, invest in and develop
25       the talents of employees who reflect the diversity of our customers and the
         communities in which we do business. . . . We are also committed to pay equity
26       for all of our employees and ensuring that we do not discriminate on the basis of
         gender or any protected category in the full range of our compensation decisions.
27
         Diversity and inclusion in our workforce starts [sic] at the top.
28

1                                          *        *        *

2      We offer all of our employees unconscious bias training, which examines how
       our biases could hamper our efforts to retain a strong and highly engaged
3      workforce.

4                                          *        *        *

5      In addition to fostering diversity and inclusion at Oracle, we support efforts to
       build a future pipeline of diverse talent in the technology industry globally.
6
                                           *        *        *
7
       The Board does not believe that this stockholder proposal would enhance
8      Oracle's existing commitment to fostering a diverse and inclusive workplace.

9          61.     As a result of the misleading opposition, the proposal was defeated at the 2017

10     annual shareholders meeting.

11         62.     ███████████████████████████████████████████████

12     ███████████████████████████████████████████████████████

13     ██████████████████████████████████ Bates Nos. ORCL-220_571. ██████████

14     ███████████████████████████████████████████████████████

15     ███████████████████████████████████████████████████████

16     ████████████████████████ Bates Nos. ORCL-220_585.

17         63.     █████████████████████████████████████████████████

18     ███████████████████████████████████████████ ███████████████

19     ███████████████████████████████████████████████████████

20     ███████████████████████████████████████████████████████

21     ████████████████████████████████████ Bates Nos. ORCL-220_000543; see also

22     Board Resolutions [ORCL-220_000558-559]. Yet ██████████████████████

23     ███████████████████████████████████████████████████████

24     ████████████████████. Bates Nos. ORCL-220_000549-550. ███████████

25     ███████████████████████████████████████████ Bates Nos. ORCL-

26     220_000544, 549, 557. ████████████████████████████████████

27     ██████████████████████████████ Bates Nos. ORCL-220_000549-550.

28

                                              17

64.     On September 26, 2018, the Board issued its opposition to the shareholders'
2018 proposal for a pay equity report with further non-descript and negligent representations:

> We are committed to ensuring that we do not discriminate on the basis of gender
> in our compensation programs, and are further committed to diversity and
> inclusion in our workforce. We believe the creation of the report requested by
> this proposal would be costly and time-consuming and, in light of our long-
> standing efforts in this area, would not lead to meaningful gains in support of
> workforce diversity and gender pay equity.
>
> Our compensation programs are designed to prevent gender pay differences by
> setting pay ranges by job. Pay decisions are based on many non-discriminatory
> factors, including knowledge, experience, specific product expertise,
> geographical location and performance. Additionally, managers receive training
> on our policies that prohibit discrimination in employment, including in pay.
> "Gender pay gap," as defined in the proposal, is not a meaningful measure and
> does not account for many factors which impact pay, including those listed
> above.
>
> As a global company with approximately 137,000 employees and customers in
> over 175 countries, Oracle believes that a diverse workforce is critical to driving
> creativity, innovation and growth. We make every effort to attract, invest in and
> develop the talents of employees who reflect the diversity of our customers and
> the communities in which we do business. We believe a diverse workforce
> enables us to better anticipate and meet our customers' changing needs in a fast-
> paced global economy and deliver greater value to our stockholders.
>
> Diversity and inclusion in our workforce starts [sic] at the top.
>
> *     *     *
>
> We offer all of our employees unconscious bias training, which examines how
> our biases could hamper our efforts to retain a strong and highly engaged
> workforce.
>
> *     *     *
>
> In addition to fostering diversity and inclusion at Oracle, we support efforts to
> build a future pipeline of diverse talent in the technology industry globally.

65.     As a result of another misleading opposition, the proposal was defeated at the
2018 annual shareholders meeting.

66.     Committee minutes show ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮     Bates Nos. ORCL-220_000561. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   █████████████████████████████  Bates Nos. ORCL-220_000561-563. ███████

2   ████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   ████████  Bates Nos. ORCL-220_000561-565.

5   67.   █████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   █████████████████████████████████████████. Bates Nos. ORCL-220_571, 574, 575,

8   577.

9   68.   █████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  █████████████████████████████████████████████. Bates Nos. ORCL-

13  220_615, 616, 661, 662, 685, 686.

14  **B.    The Defendants' 2019 Pay Equity Report Opposition**

15  69.   Like in 2017 and 2018, Oracle's shareholders advanced the following proposal

16  in 2019 to alleviate the Company from the continuous employment discrimination malignancies:

17  **PROPOSAL NO. 4**

18  **STOCKHOLDER PROPOSAL REGARDING PAY EQUITY REPORT**

19                          *        *        *

20  Shareholders request Oracle prepare a report by April 2020 (at reasonable cost,
    omitting proprietary and confidential information), identifying whether a gender
21  pay gap exists among its employees, and if so, outline the steps being taken to
    reduce the gap.  The Organization for Economic Cooperation and Development
22  has defined the gender pay gap as the difference between male and female
    earnings expressed as a percentage of male earnings.

23  70.   In support of their proposal, the shareholders stated:
24
    Companies that exhibit significant pay disparities by gender, race or ethnicity
25  face regulatory, litigation and reputational risk.  Oracle already faces a
    Department of Labor lawsuit alleging disparities in pay and hiring and an
26  employee lawsuit alleging pay discrimination.  Multiple states have adopted
    strong equal pay laws.  Employers with over 250 employees in the U.K.—
27  including Oracle UK—must publish data on their gender pay gaps annually.

28

Oracle does not report on pay equity among its U.S. employees.  In contrast, Apple, Microsoft, eBay, and salesforce.com publish information on their gender pay equity practices and the results of gender pay assessments.

71.    In opposition to this resolution, the Individual Defendants again caused the following false statements to issue in the 2019 Proxy:

**Statement in Opposition to Proposal No. 4**

As a global company with approximately 136,000 employees and customers in over 175 countries, *we are committed to ensuring that we do not discriminate on the basis of gender in our compensation programs, and we are further committed to diversity and inclusion in our workforce.*  We make every effort to attract, invest in and develop the talents of employees who reflect the diversity of our customers and the communities in which we do business.  *We believe a diverse workforce enables us to better anticipate and meet our customers' changing needs in a fast-paced global economy and deliver greater value to our stockholders.*

*Diversity and inclusion in our workforce starts [sic] at the top.*  Thirty-three percent of our Board members are women or come from a diverse background (four of our 15 Board members are women, including one of our CEOs).  Since 2006, Oracle Women's Leadership (OWL), a leadership and professional development program, has sought to develop, engage and empower current and future generations of Oracle women leaders.  Each of our more than 80 worldwide OWL communities is led by a senior Oracle woman leader and focuses on professional development, networking and community outreach at the local level.  OWL's global events are open to all Oracle employees, promoting diversity and inclusion across our workforce.

*In addition to fostering diversity and inclusion at Oracle, we support efforts to build a future pipeline of diverse talent in the technology industry globally*.

72.    Moreover, in opposition to the 2019 Pay Equity Report, the Director Defendants added:

Oracle promotes equality through our hiring, pay and promotions processes. Specifically:

- New jobs are posted publicly for anyone to apply.

- *Hiring and promotion pay decisions are based on a variety of non-discriminatory factors, including consideration of the job itself and the pay range associated with it, as well as the skills, experience, education and expertise the individual brings to Oracle—not race or gender.*

- Our compensation framework aims to achieve equity, as well as recognition of each employee's particular knowledge, skills, abilities, performance, experience, and contributions to the company.

20

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

- Inquiries about candidates' prior salary history pay are prohibited. This policy has been in effect in Oracle's U.S. offices prior to the enactment of state laws in California and elsewhere prohibiting this practice.

3

4

5

6

*Relatively few global companies have publicized their internal pay data and it does not appear to have had any additional beneficial effect. We believe the creation and publication of a pay equity report as requested by this proposal would be costly and time-consuming and, in light of our long-standing efforts in this area, would not lead to meaningful gains in support of workforce diversity and gender pay equity.*

7

73.    Like with 2017 and 2018, the Individual Defendants' 2019 pay equity report

8

opposition contained material omissions as it failed to mention and address:

9

(a)    The DOL Lawsuit and the $401 million in potential damages;

10

(b)    The DOL confirmed patterns of employment discrimination dating back

11

to at least 2013;

12

(c)    Oracle withheld and destroyed information from the DOL during its

13

investigation;

14

(d)    The DOL lawsuit could affect thousands of employees just in Redwood

15

City;

16

(e)    The Employment Class Action;

17

(f)    Oracle pays women $13,000 less than men for substantially similar work;

18

(g)    Oracle has an unexplained gender pay gap;

19

(h)    Oracle pays white male workers more than females, Black or African

20

American individuals, and Asians for the same jobs;

21

(i)    Oracle channels females, Black or African American, and Asian

22

employees into lower-paying positions;

23

(j)    Between 2013 and 2016, in particular job groups, Oracle hired only six

24

Black or African American college graduates, and zero in 2016;

25

(k)    Oracle pays Black or African American and Asian employees 25% less

26

than their peers;

27

(l)    Oracle favors Asian workers over non-Asian workers;

28

(m)    Oracle favors Asian work visa holders; and

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    (n)    Oracle relies on prior salary in setting initial pay.

2    74.    Moreover, like with 2017 and 2018, the Individual Defendants' pay equity report

3    opposition was materially misleading in that the Board— ████████████████████

4    ████████████████████████████████—represented:

5    (a)    Oracle "[is] committed to ensuring that [it does] not discriminate on the

6    basis of gender in our compensation programs, and [it is] further committed to diversity

7    and inclusion in our workforce."

8    (b)    Oracle "make[s] every effort to attract, invest in and develop the talents

9    of employees who reflect the diversity of our customers and the communities in which

10   we do business."

11   (c)    Oracle "believe[s] a diverse workforce enables [it] to better anticipate and

12   meet [its] customers' changing needs in a fast-paced global economy and deliver greater

13   value to [its] stockholders."

14   (d)    Oracle "support[s] efforts to build a future pipeline of diverse talent in the

15   technology industry globally."

16   (e)    Oracle's "[h]iring and promotion pay decisions are based on a variety of

17   non-discriminatory factors, including consideration of the job itself and the pay range

18   associated with it, as well as the skills, experience, education and expertise the individual

19   brings to Oracle—not race or gender."

20   (f)    "Inquiries about candidates' prior salary history pay are prohibited."

21   (g)    "Relatively few global companies have publicized their internal pay data

22   and it does not appear to have had any additional beneficial effect."

23   (h)    Oracle "believe[s] the creation and publication of a pay equity report as

24   requested by this proposal would be costly and time-consuming and, in light of our long-

25   standing efforts in this area, would not lead to meaningful gains in support of workforce

26   diversity and gender pay equity."

27   75.    ████████████████████████████████

28   ████████████████████████████████

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1        █████████████████████████████████ Like with the prior years, the

2 2019's pay equity report opposition was at odds with the DOL's and others' assessment of

3 Oracle's practices.

4        76.    In approving the misleading opposition statement in the 2019 Proxy Statement,

5 filed with the SEC and distributed to shareholders, the Board breached its fiduciary duties to

6 Oracle and violated the Oracle Code. The Board failed to ensure the Company's compliance

7 with federal securities laws, failed to maintain an adequate system of oversight, failed to ensure

8 the Company's compliance with employment laws and regulations, and exposed Oracle to

9 further and unnecessary legal expenses, regulatory penalties, civil judgments, Congressional ire,

10 and a loss of credibility and goodwill.

11        77.    In issuing the ████████ opposition to the 2019 Pay Equity Report ██████

12 █████████████████████████████, the Finance & Audit Committee Defendants

13 breached their charter duties to discuss the Company's policies regarding risk assessment and

14 management and to oversee Oracle policies and procedures comply with applicable laws and

15 regulations and with the Oracle Code. In their summary opposition to yet again oppose the

16 shareholders' request for a pay audit, the Governance Committee Defendants breached their

17 charter duties to hire legal, accounting, financial, and other advisors for Oracle's benefit. In

18 approving the pay equity opposition, the Compensation Committee failed to properly assess the

19 risks associated with Oracle's compensation practices, and such failure has had a material

20 adverse effect on Oracle.

21        78.    In distributing a misleading proxy statement that opposed a pay equity report the

22 third straight year, the Individual Defendants failed to be "champions of compliance" and adhere

23 to the Oracle Code's requirements they comply with all equal opportunity laws and regulations,

24 deal fairly with each employee, resolve employment issues promptly with correction action, and

25 oversee major risks facing Oracle.

26        79.    As a result of the misleading statements and omissions in the 2019 Proxy

27 Statement, the Board defeated the shareholder proposal for the pay equity report. On

28 November 22, 2019, Oracle published the voting results in a Form 8-K:

**Proposal No. 4: Stockholder Proposal Regarding Pay Equity Report**

The stockholders did not approve a stockholder proposal requesting that Oracle prepare a gender pay equity report, with 942,828,312 shares in favor, 1,699,773,596 shares against, 70,518,657 shares abstaining and 284,909,463 broker non-votes.

80.    The Board and committee actions in opposing the 2019 Pay Equity Report were no different than their oppositions in 2017 and 2018.  And like the prior years, the misleading 2019 Proxy Statement actually and proximately caused the shareholders to reject the pay equity report at the 2019 Shareholders Meeting.

IX.    <u>CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION</u>

81.    In breaching their respective duties and violations of federal securities laws, the Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct—all in furtherance of a common plan or design.

82.    Further, in breaching their respective duties and violations of federal securities laws, the Individual Defendants aided and abetted, assisted, and rendered substantial assistance to each other in breaching their respective duties and violations of federal securities laws.

83.    The Individual Defendants' conduct was designed to and did deceive the shareholders of Oracle and permit flawed and ineffectual internal controls over the Company's operations.

84.    In taking such actions to substantially assist the commission of this wrongdoing, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

85.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to conceal adverse information concerning the Company's business and operations.

86.     Because the Individual Defendants' actions occurred under the authority of the Board, and its committees, each Individual Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct.

**X.      THE DEFENDANTS' BREACHES OF THEIR DUTIES AND VIOLATIONS OF FEDERAL SUCURITIES LAWS DAMAGED ORACLE**

87.     As a direct and proximate result of Defendants' breaches of fiduciary duties and violations of federal securities laws, Oracle has suffered and continues to suffer significant damages and harm.

88.     The Board has deprived Oracle of informed shareholder voting.

89.     The Board has deprived Oracle of the ability to predict and/or limit exposure to and liability from the current and potential future employment discrimination matters.

90.     Oracle may continue to discriminate, remain incompliant with regulations, and face more governmental fines and civil judgments.  Further legal action, or internal complaints and investigations, will continue to cause Oracle extensive attorney fees and legal costs, accountant costs, investigator costs, and auditor costs.  Any settlement of or judgment in those actions, or in any related and/or similar actions, will cost Oracle even more.

91.     Oracle has sustained the costs, expenses, and unjust enrichment of the compensation and benefits paid to the Defendants, and other members of Oracle's management, while they breached their fiduciary duties and violated federal securities laws.

92.     The misleading 2019 Proxy has and will harm Oracle's reputation with the government and the public, and results in a loss of credibility, corporate image, goodwill, and market capitalization.

93.     Finally, Oracle will sustain the costs and expenses associated with issuing the appropriate corrective disclosures and/or board reelections made necessary by the Individual Defendants' breach of fiduciary duties and violation of federal securities laws.

**XI.     DERIVATIVE ALLEGATIONS**

94.     Plaintiff brings this action derivatively in her own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Oracle as a direct result of the

25

1  Individual Defendants' breaches of fiduciary duty, waste of corporate assets, unjust enrichment,

2  and violations of the federal securities laws.

3      95.    Oracle Corporation and Oracle America, Inc. are named as Nominal Defendants

4  solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court

5  that it would otherwise not have.

6      96.    Plaintiff will adequately and fairly represent the interests of the Company and its

7  shareholders in prosecuting this action.

8      97.    Due to the Board's direct involvement in the wrongdoing, its members' lack of

9  independence, Ellison's domination of the Board, due to the substantial likelihood of liability

10  its members face, and for other reasons outlined below, prosecution of this action independent

11  of the Board is in the best interests of Oracle and its shareholders.

12  **XII.    DEMAND ON THE BOARD IS FUTILE**

13      98.    Plaintiff incorporates by reference and realleges each and every allegation

14  contained above, as though fully set forth herein.

15      99.    Plaintiff has not made any demand on the Board to institute this action because

16  such a demand would be futile, wasteful, and useless.  Demand is futile where a majority of

17  directors is either interested in, or are not independent of a person interested in, the claims

18  asserted.  Such futility may exist when, among other things, a majority of the board faces a

19  substantial risk of personal liability and/or is incapable of considering a demand because of the

20  influence of, domination of, and/or because of a close, long-standing personal relationship with

21  the corporation's largest stockholder.  When a board has even number of directors, a majority

22  of directors is considered to be half the board.

23      100.   Oracle's current Board has 14 members: officer/directors Ellison, Catz, and

24  Henley ("the Officer Defendants") and directors Berg, Boskin, Chizen, Conrades, Garcia-

25  Molina, James, Moorman, Panetta, Parrett, Seligman, and Sikka.  A majority of Oracle's board

26  is 7 directors.  Here, demand is futile as to, at least, 7 directors as follows:

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### A.  Oracle Admits Defendants Ellison, Catz, Henley, and James Lack Independence

101.  Ellison, Catz, and Henley fall under the NYSE's "bright-line" independence disqualification.  According to the NYSE's Listing Standards, a director is not independent if he or she is, or has been within the last three years, an employee or an executive officer of the listed company.  Because Ellison is CTO, Catz is CEO, and Henley is executive vice chairman, they are not independent.  Accordingly, the 2019 Proxy Statement admits that Ellison, Catz, and Henley are not "independent" as defined by the NYSE listing standards.

102.  Furthermore, defendants Ellison, Catz, and Henley are not independent because their principal professional occupation is their employment with Oracle.

103.  Accordingly, defendants Ellison, Catz, and Henley lack independence from the other members of the Board due to their interest in maintaining their executive positions and substantial compensation.  This lack of independence renders defendants Ellison, Catz, and Henley incapable of impartially considering a demand to commence and vigorously prosecute this action.

104.  In the 2019 Proxy Statement, Oracle also admits defendant James lacks independence given her appointment as Chairman and CEO of Ampere Computing LLC. ("Ampere").  In April 2019, Oracle invested $40 million in an equity fundraising round for Ampere, which develops microprocessors for cloud and edge servers.  Further, Oracle appointed one director to Ampere's board, Oracle holds less than 20% of the outstanding equity of Ampere, and, in fiscal 2019, Oracle paid Ampere approximately $419,000 for hardware.

105.  Accordingly, defendant James lacks independence from the other members of the Board due to her interest in maintaining these lucrative relationships.  This lack of independence renders defendant James incapable of impartially considering a demand to commence and vigorously prosecute this action.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**B.**     **The Individual Defendants, Including the Officer Defendants, Face Substantial Liability**

106.     The Individual Defendants knowingly violated Section 14(a) of the Securities Exchange Act, and rule 14a-9 promulgated thereunder, and thereby also breached their duty of loyalty to Oracle.

107.     By their board action, the Individual Defendants issued, and participated in the issuance of, the materially misleading written opposition to the shareholder pay equity report proposal in the 2019 Proxy Statement.  Among other misrepresentations referenced herein, the Board mislead by exclaiming Oracle's alleged strict adherence to equal employment and pay equity.

108.     In addition, by their board action, the Individual Defendants omitted material facts necessary in order to make their written opposition to the shareholder pay equity report proposal in the 2019 Proxy Statement not false or misleading, or necessary to correct any statement therein.  Among other omissions referenced herein, the Board failed to mention Oracle's discriminatory employment practices, Oracle's actual employment and pay data, the Employment Discrimination Actions, or the Board's investigation or confirmation, if any, into the DOL or California Superior Court findings of employment discrimination and pay disparities.

**C.**     **Defendant Ellison Dominates Oracle and the Board**

109.     In addition to his current title of CTO, defendant Ellison is its controlling stockholder.  According to the 2019 Proxy Statement, he owed 1,172,919,853 Oracle shares (35.4%) as of September 20, 2019.

110.     In addition to his controlling stockholder position, defendant Ellison's control, domination, and influence at Oracle, and over the Board, is notorious and well-documented. Former technology journalist, Alex Vieux, wrote, "Larry has an acute sense of when he doesn't need people anymore.  He's like a juicer.  He squeezes people dry and then discards them."

111.     Karen Southwick ("Southwick"), author of a defendant Ellison biography entitled *Everyone Else Must Fail*, wrote, "Ellison has created Oracle in his own image" and that

"[n]o other large company is as dominated by a single individual."  Marc Benioff, a former Oracle executive, was quoted in Southwick's book, stating, "Larry [Ellison]'s like a spiritual guru, and Oracle is like a cult."  Southwick also quoted former board member Joe Costello ("Costello") stating that defendant Ellison treats the Oracle Board as a "necessary inconvenience."  Defendant Ellison drove Costello off of the Board because, after Costello started his own company, it chose an Oracle competitor for a particular contract.  Defendant Ellison threatened to ruin Costello and his reputation to the point where Costello resigned.

112.   Former Oracle President, Chief Operating Officer, and Director Ray Lane ("Lane") has stated that, "[Costello] was a very valuable board member, and his resignation should have sent a signal to everyone: the board serves at Larry's will."

113.   As reported by Forbes magazine, "Silicon Valley is littered with refugees from Oracle Corp., former acolytes who fled for better jobs or were fired after fighting with strongman Larry Ellison."  For example, Ellison forced Lane to resign in June 2000—three weeks before approximately $70 million in options were about to vest (and thus that Lane forfeited)—after a leadership fight with Ellison.  Forbes also quoted a former Oracle director saying, "This is a team, and Larry is the only captain.  If someone wants to pop up and announce they're the star— poof!  You're out."

114.   In another Ellison biography by Matthew Symonds, *Software: An Intimate Portrayal of Larry Ellison and Oracle* (2003), when Ellison was CEO, he told Lane that, "The whole company needs to understand that there is one centralized point of authority, and it will be the CEO."

115.   In addition to other refugees, Oracle Executive Vice President Gary Bloom left Oracle because Ellison opposed him, favoring defendant Catz.  In Symonds' book, Bloom stated, "It got to a point where I was responsible for the vast majority of the company, yet I had no contact with the guy who actually ran the company."

116.   Further, Ellison removed former Oracle executive Terence Garnett after conflict wherein Ellison had instructed him, and Garett refused, to steer business opportunities and Oracle corporate resources to Ncube Corp., a company owned by Ellison, and directed Oracle

engineers to develop software that would run better on Ncube computers than on competing machines.

117.    Notably, in addition the former executive and board members, even current board members admit defendant Ellison's dominance over Oracle and the Board.  Defendant Berg, at the Oracle stockholder meeting in October 2008, stated, "I guess as a founder, owner, operator, you can equate [Ellison] to the owner of a team who can sit up in a skybox and own the franchise."

118.    Finally, following defendant Catz's appointment as CEO, industry insiders acknowledge Ellison's continued and present dominance over everyone at Oracle, including the Board:

(a)    "He's not going anywhere," said Tim Bajarin, technology analyst and president of Creative Strategies;

(b)    "He's going to continue to do the things he's going to continue to do," said Scott McNealy, former Sun Microsystems CEO and current chairman of social media marketing start-up, Wayin, stated; and

(c)    "There always has been & always will be, one CEO at Oracle," said Marc Benioff, CEO of Salesforce.com, who worked at Oracle and got funding for his company from Ellison.

119.    Defendant Catz, in addition to being CEO (and having received about $514 million in compensation from Oracle since 2007), has been described by CNNMoney and Fortune as Ellison's "secretive but effective right hand," "Ellison's ultra-effective consigliere," and "Ellison's Ms. Inside."

120.    *Mercury News* reported that: "[a]t one point, Ellison and Catz dated, according to two biographies of Ellison and interviews with former Oracle employees.  And they remained friends over the next decade."  In the Symonds biography, he wrote that Catz has "a degree of loyalty to her boss that transcended any personal agenda of her own."  And Ellison himself has stated that he and Catz "share a high-bandwidth communications link," that they "finish each other's sentences" and that he relies on her as his "chief confidante and counselor."  In the

1   Symonds biography, Catz is quoting as saying, "I came in [to Oracle] with absolutely no agenda

2   other than to help Larry.  That actually makes my job incredibly easy.  If Larry wants something

3   done, now it happens because I'm going to check that it has."

4       121.   In August 2006, Forbes quoted defendant Henley as saying that, "[Catz's] power

5   isn't that she has a lot of people working for her; she doesn't. . . .  Her power is that she's on the

6   same wavelength as Larry."  Catz is also quoted in the Symonds' biography as stating, "I'm not

7   interested in building power and I don't have any individual power here.  People will send me

8   things for my approval, and my response will always be okay, if it's within the scope of a

9   decision I already know Larry has approved.  I say that as a reminder that I don't have any power

10  of my own."

11      122.   Demand futile is, perhaps, best underscore by the title of Mike Wilson's book.

12  He authored "The Difference Between God and Larry Ellison: God Doesn't Think He's Larry

13  Ellison" stated, "Oracle is Larry Ellison, and Larry Ellison is Oracle."

14
       **D.**   **The Rest of the Board is Incapable of Considering a Demand Because of**
15            **Ellison's Influence and Domination**

16           **1.**   **Director Seligman**

17      123.   Director Seligman is not independent.  Besides the over $5.3 million in cash and

18  stock awards earned since 2006, and her approximate $470,000 in annual compensation, she is

19  beholden to strongman Ellison and his righthand Catz.

20      124.   Seligman and her husband, Ernest von Simson ("von Simson"), co-founded the

21  Research Board, a technology think tank, advising officers of over 100 of the largest technology

22  firms in North America and Europe, and Ostriker von Simson, a consultant firm, which advises

23  global enterprises on technology.  Ellison has been a guest speaker at both the Research Board

24  and the CIO Strategy Exchange, chaired by Ostriker von Simson.  The intimate relationship and

25  admiration between Ellison, Seligman, and von Simpson is displayed in von Simson's book,

26  "*The Limits of Strategy: Lessons in Leadership from the Computer Industry*," wherein von

27  Simson deems Ellison one of the "Star Walkers," along with Michael Dell, Steve Jobs, Scott

28  McNealy, and Bill Gates.

125.     In 2010, Seligman's husband published a book for which Ellison wrote a blurb. That book mentions that Seligman and von Simson have known Ellison since the late 1980s and have had "numerous interactions over the subsequent years, including lunch at Ellison's Silicon Valley estate."

126.     In addition to the above relations, and aside from Oracle, Ellison has other power over Seligman.  She owns two condos on the 140-square-mile island of Lanai in Hawaii, which Ellison acquired in 2012 for $300 million.  Ellison owns nearly the entire island, including many of the commercial buildings, homes, and apartments, the Four Seasons hotels and golf courses, the water company and utilities, half the roads, one of the two grocery stores, the community center and pool, the movie theater, and approximately 88,000 acres of land.  Ellison formed a force called Pulama Lanai to operate the island and it employs a majority of the adults on the island.

127.     According to The New York Times, Seligman's condos are located near the Four Seasons Resort Lanai and overlook one of the golf courses.  With ownership of these residences comes the eligibility to become a member of the Island Club, which provides access to all Four Seasons' facilities and golf courses for half price.

128.     Also, Seligman and von Simson are one of four couples making up the "Champion" donors' category (the highest donor circle for individual donors) to the TriLanai, which offers races on the Hawaiian Island of Lanai.  Pulama Lanai sponsors TriLanai.

129.     In addition to their deep friendship, Ellison's control and dominance over Seligman, prevent her from exercising independence—among other things, if she were to cross Ellison, her days on Lanai would be over.

### 2.     Director Conrades

130.     Director Conrades is not independent.  Besides the over $4.8 million in cash and stock awards earned since 2008, and his approximate $706,000 in annual compensation, he is beholden to strongman Ellison and his righthand Catz.

131. Conrades has held multiple high-level positions at Akamai Technologies Inc. ("Akamai"), and Oracle and Akamai have "made substantial purchases from each other." While Conrades was Executive Chairman of Akamai, it received over a million dollars from Oracle.

132. Conrades is also a major investor in and a director of MyTaskIt, a software startup. MyTaskIt's Chief Technology Officer is Michael Russo, a Senior Director of Development at Oracle. Russo needs Oracle management's approval to continue working at MyTaskIt.

133. Finally, Conrades is Partner Emeritus at Polaris Venture Partners and Managing Partner at Longfellow Venture Partners, which are both venture capital firms focused on areas in which Oracle is an active acquirer. Polaris and Longfellow also have portfolio companies that rely on Oracle technology or are managed by former Oracle executives.

134. In addition to risking his compensation, if he were to cross Ellison, Conrades would lose these lucrative business relations and connections.

### 3. Director Berg

135. Director Berg is not independent. Besides the over $6.3 million in cash and stock awards earned since 2009, and his approximate $579,000 in annual compensation, he is beholden to strongman Ellison and his righthand Catz.

136. With respect to compensation, according to buzzfile.com, Berg's other source of income, Northside Services, LLC, is currently estimated to have an annual revenue of only $211,032, and it has 4 employees. So, Berg's Oracle compensation comprises nearly all his personal income.

137. Besides all his compensation, Berg is tied to Ellison in other ways. From 1985 to 2012, Berg was the chairman and CEO of International Creative Management, Inc. ("ICM"), which is an entertainment talent agency. According to the Los Angeles Times, ICM represented David Ellison, Larry Ellison's son, in his acting career. Berg also assisted David Ellison finance the movie "Flyboys" (less than 30% of the $60 million in production costs), ICM acted as the U.S. sales agent for the movie, and Berg organized the movie release party on defendant Ellison's yacht.

1                 **4.**      **Director Boskin**

2       138.    Director Boskin is not independent.  Besides the over \$9.4 million in cash and

3 stock awards earned since 2009, and his approximate \$691,000 in annual compensation, he is

4 beholden to strongman Ellison and his righthand Catz.

5       139.    Boskin is a Professor of Economics and Hoover Institution Senior Fellow at

6 Stanford University, where he has taught since 1971.  Stanford University has close ties to

7 Ellison, including the following:

8             (a)      In the past 3 years alone, Ellison, through his foundation donated nearly

9 \$3 million to Stanford;

10             (b)      In the past 10 years alone, Ellison, through Oracle, donated between

11 \$19 and \$30 million to Stanford;

12             (c)      Oracle admits in the 2019 Proxy Statement that, for at least the past

13 10 years, Oracle board members have donated to Stanford;

14             (d)      Oracle consistently makes yearly donations of between \$5,000 and

15 \$20,000 to the Stanford Institute for Economic Policy Research; and

16             (e)      Oracle has granted Stanford \$25 million over 10 years for the new

17 Stanford Hospital.

18       140.    The Delaware Court of Chancery, in connection with prior derivative litigation,

19 stated the Ellison Medical Foundation (now The Lawrence Ellison Foundation) granted

20 approximately \$10 million to Stanford.  So, Oracle directors with ties to Stanford likely believe

21 that their continued employment there or service on boards and committees result in part from

22 such donations and, thus, they are not be independent of Oracle and Ellison.  *See In Re Oracle*

23 *Corp. Derivative Litigation*, 824 A.2d 917, 942 (Del. Ch. 2003) (finding that ties between

24 Ellison, Boskin, and Standard so substantial as to cause reasonable doubt about impartiality).

25       141.    Finally, Boskin donated \$500,000 to the UC Davis Health System where Ellison

26 established the Lawrence J. Ellison Ambulatory Care Center.  In 1999, Boskin was injured in a

27 car accident, and media reported Ellison as a "constant visitor," often bringing to Boskin sushi

28 in his hospital room.

142.   In addition to risking his compensation and friendship, if he were to cross Ellison, Boskin and Stanford would lose these valuable donations and grants.

**5.   Director Chizen**

143.   Director Chizen is not independent.  Besides the over $7.1 million in cash and stock awards earned since 2009, and his approximate $564,000 in annual compensation, he is beholden to strongman Ellison and his righthand Catz.

144.   Like Boskin, Chizen's ties to Stanford render him non-independent from Ellison. Chizen has been a speaker in a Stanford University course on Cloud computing, which was taught by former Oracle President Timothy Chou.  In 2013 and 2014, The Chizen Family Foundation, of which Chizen is President and a Director, has also donated to Stanford Hospital.

145.   If Chizen were to cross Ellison, as the many others in Silicon Valley have learned, he would lose his half a million in annual compensation and be shut out at Stanford.

**6.   Director Garcia-Molina**

146.   Defendant Garcia-Molina is not independent.  Besides the over $5.3 million in cash and stock awards earned since 2005, and his approximate $460,000 in annual compensation, he is beholden to strongman Ellison and his righthand Catz.

147.   Garcia-Molina has been a professor in the Computer Science and Electrical Engineering departments at Stanford University since 1995, and he was chairman of the department of Computer Science from 2001 to 2004.  He has been a professor at Stanford University since 1992.  From 1994 until 1997, he was the director of the Computer Systems Laboratory at Stanford University.

148.   If Garcia-Molina were to cross Ellison, as the many others in Silicon Valley have learned, he would lose his half a million in annual compensation and be shut out at Stanford.

**7.   Director Panetta**

149.   Defendant Panetta is not independent.  Besides the over $2.0 million in cash and stock awards earned since 2015, and his approximate $485,000 in annual compensation, he is beholden to strongman Ellison and his righthand Catz.

35

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

150.    In addition to this compensation from Oracle, Panetta has personal ties to Ellison and Ellison's daughter, Margaret Elizabeth Ellison ("Megan Ellison").   Panetta played an important role in the development of the Megan Ellison-funded film, "Zero Dark Thirty," about the United States government's mission that lead to the killing of Osama Bin Laden.   According to declassified internal CIA documents obtained by Vice News, via the Freedom of Information Act, Panetta (who was the Director of the CIA from 2009 to 2011) personally offered to assist producer Mark Boal with unprecedented access to CIA information and they remained in close contact throughout the filmmaking process.

151.    According to a draft of a Pentagon inspector general's report: "Leon Panetta was fully cooperating with the movie project and that several CIA staff used White House approved talking points to talk to Mr. Boal about the intelligence that led to UBL's [Usama bin Laden's] location."   Megan Ellison not only provided the financing for "Zero Dark Thirty," but was also heavily involved in its production.   Through her company, Annapurna Productions, Megan Ellison covered the entire approximately $45 million budget for "Zero Dark Thirty."

152.    In addition to risking his compensation and friendship, if he were to cross Ellison, Panetta would lose other entertainment ventures with the Ellison family.

**E.    Demand Is Excused as Board Action Would Prejudice the Individual Defendants in Other Lawsuits**

153.    Any Board action here to investigate and pursue claims for breach of fiduciary duties, unjust enrichment, and securities violations against the Individual Defendants would expose the Board to liability in the Employment Discrimination Actions and may poison their prosecution against the DOL in the Washington D.C. district.

154.    This is likely why,

Bates Nos. ORCL-220_000709, 712.

36

## XIII. **CLAIMS FOR RELIEF**

### **COUNT I**

**Breach of Fiduciary Duties**
**(Against All Individual Defendants)**

155.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.    Each of the Individual Defendants owed and owe Oracle fiduciary and other obligations. Specifically, they owed and owe Oracle: (i) the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, as well as the duty of candor and truthful disclosure in their public statements, including proxy statements; (ii) fiduciary duties imposed by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on the Individual Defendants vis-a-vis the corporation and its individual shareholders; and (iii) fiduciary duties imposed by the Company's corporate governance documents, including by the committee charters and by the Oracle Code.

157.    Each Individual Defendant violated and breached their fiduciary duties of good faith and fair dealing, loyalty, due care, and candor and truthful disclosure. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ There is zero reason to believe the Board's 2019 action differed ██████████████████

158.    Each of the Officer Defendants violated and breached their fiduciary duties in allowing the Company to violate federal securities laws, rules, and regulations.

159.    The Finance & Audit Committee Defendants violated and breached their fiduciary duties by failing to prudently evaluate the Company's policies regarding risk assessment and management, and failing to prudently oversee the Company's compliance with applicable laws and regulations and with the Oracle Code

37

1    160.   The Governance Committee Defendants violated and breached their fiduciary

2    duties. ████████████████████████████████████████████

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████

5    161.   The Compensation Committee Defendants violated and breached their fiduciary

6    duties by failing to prudently gage the Company's risk with respect to compensation policies.

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████

12   162.   Each Individual Defendant also violated the Oracle Code by failing to prudently

13   oversee management and major risks facing Oracle.

14   163.   As a direct and proximate result of all of the above breaches of fiduciary and

15   other duties, Oracle sustained significant damages.  Accordingly, the Individual Defendants,

16   including the Finance & Audit Committee Defendants, Governance Committee Defendants, and

17   Compensation Committee Defendants, are all liable to the Company.

18   164.   Plaintiff, on behalf of Oracle, has no adequate remedy at law.

## COUNT II

**Waste of Corporate Assets**
**(Against All Individual Defendants)**

22   165.   Plaintiff incorporates by reference and realleges each and every allegation

23   contained above, as though fully set forth herein.

24   166.   As a result of the Individual Defendants' breaching fiduciary duties owed to the

25   Company, Oracle is subject to the legal actions and government investigations alleged herein.

26   The Individual Defendants have caused Oracle to waste its corporate assets by forcing the

27   Company to expend valuable resources in investigating internal and external employment

28   discrimination and pay disparity claims, including, without limitation, attorney fees and legal

expenses, internal and external investigative costs, cost of corrective disclosures, and any ensuing costs from a potential settlement or adverse judgment.

167.    As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

168.    Plaintiff, on behalf of Oracle, has no adequate remedy at law.

## COUNT III

**Unjust Enrichment**
**(Against All Individual Defendants)**

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Oracle.  The Individual Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company, wasting the Company's assets, and violating federal securities laws.

171.    Plaintiff, as a shareholder and representative of Oracle, seeks restitution from the Individual Defendants and seeks a Court order disgorging all profits, benefits, and other compensation obtained by the Individual Defendants while they were breaching fiduciary duties, wasting assets, and violating federal securities laws.

172.    Plaintiff, on behalf of Portola, has no adequate remedy at law.

## COUNT IV

**Violations of § 14(a) of the Exchange Act and Rule 14a-9**
**(Against All Individual Defendants)**

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth in this paragraph, except to the extent those allegations plead knowing or reckless conduct by the Individual Defendants.  This claim is based solely on negligence, not on any allegation of knowing or reckless conduct by or on behalf of the Individual Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any

39

allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

174.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

175.    The individual Defendants negligently issued, caused to issue, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2019 Proxy Statement.

176.    In the 2019 Proxy Statement, the Individual Defendants urged stockholders to vote against the stockholder proposal for Oracle to solicit the 2019 Pay Equity Report.  The Board made materially false and misleading statements and omitted material facts necessary to make the 2019 Pay Equity Report not false or misleading.  Among other things, the Board mentioned nothing about Oracle's actual employment data or the Board's investigation or confirmation, if any, into the DOL or California Superior Court findings.

177.    These misrepresentations and omissions conveyed that Oracle was prudently and fully investigating and resolving any and all employment discriminations matters and, thus, was protecting Oracle from related legal and governmental investigations and prosecutions.

178.    The misleading information contained in the 2019 Proxy Statement was material to Oracle's shareholders in determining whether to authorize the 2019 Pay Equity Report.

179.    If the Board had not misled the shareholders, and not omitted material information, the shareholders would have voted for the 2019 Pay Equity Report.

180.    The shareholders' rejection of the 2019 Pay Equity Report, in their reliance on the Board's false and misleading statements, and omissions, has actually and proximately put Oracle in extensive legal danger, exposed it to further government investigation, and exposed it

to extreme attorney fees and costs via internal and external employment discrimination investigations, government inquiries, and various legal actions.

181.    Plaintiff, on behalf of Oracle, seeks relief for damages inflicted upon the Company based upon the misleading 2019 Pay Equity Report, including, without limitation, all attorney fees, courts costs, and investigative costs associated with, among other things, corrective disclosures and statutorily-compliant future proxy statements.

182.    Plaintiff, on behalf of Oracle, is further entitled to declaratory and injunctive relief, including, without limitation, an order for a special proxy vote for the 2019 Pay Equity Report with proper corrective disclosures, an order preventing the omission of material facts and requiring full disclosure of all material facts in all future proxy statements, and an order that Oracle to take all necessary actions to reform and improve its corporate governance.

183.    Plaintiff, on behalf of Oracle, has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Oracle be fully protected from the immediate and irreparable injury that the Individual Defendants' actions threaten to inflict.

## XIV.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment as follows:

A.    Finding that a shareholder demand on the Oracle Board would have been a futile and useless act;

B.    Finding that the Individual Defendants have breached their fiduciary duties to Oracle, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

C.    Ordering equitable and injunctive relief with respect to the 2019 Proxy Statement including, without limitation, an order of a special proxy vote for a pay equity report with proper corrective disclosures;

D.    Ordering equitable and injunctive relief with respect to the 2020 Proxy Statement including, without limitation, an order preventing the omission of material facts and requiring full disclosure of all material facts, in compliance with federal securities laws;

E.    Ordering Oracle to take all necessary actions to reform and improve its corporate governance and internal procedures to ensure compliance with applicable employment laws and

41

regulations, so as to protect the Company and its shareholders from a repeat of the damaging events described herein, including, without limitation, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

       i.     to develop and implement procedures for greater shareholder input into Oracle's employment and compensation policies;

      ii.    to develop and implement procedures to more properly and fully investigate—and, if warranted, terminate—employees, managers, and executives liable for employment discrimination;

     iii.   to develop and implement better training of all managers, executives, and board members in applicable employment discrimination laws; and

     iv.   to improve the accounting and audit processes by which the board obtains employment and compensation trends and data, so that the Company discloses all material information to the SEC, the public, and its shareholders.

F.    Awarding against each Individual Defendant, jointly and severally, in favor of Oracle the amount of damages it sustained, as determined at trial, together with pre-judgment and post-judgment interest;

G.    Ordering Individual Defendants to return to Oracle all compensation and remuneration of any kind the Company paid to them while in breach of their fiduciary duties, committee charters, the Oracle Code, and in violation of federal securities laws;

H.    Awarding Plaintiffs attorney fees and court costs, including expert fees;

I.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.    Granting such other and further relief as this Court deems just and equitable.

1   **XV.     DEMAND FOR JURY TRIAL**

2          Plaintiff demands a jury trial as to all issues so triable.

3   Dated:  July 30, 2020                    **JOHNSON FISTEL, LLP**

4                                    By:   */s/ Brett M. Middleton*
                                          BRETT M. MIDDLETON
5
                                          FRANK J. JOHNSON
6                                         JOHN J. O'BRIEN
                                          655 West Broadway, Suite 1400
7                                         San Diego, CA 92101
                                          Telephone: (619) 230-0063
8                                         Facsimile: (619) 255-1856
                                          FrankJ@johnsonfistel.com
9                                         BrettM@johnsonfistel.com
                                          JohnO@johnsonfistel.com
10
                                          *Attorneys for Plaintiff Alison Sherman*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

<u>VERIFICATION</u>

I, Alison Sherman, hereby declare as follows:

I am a plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Violation of Federal Securities Laws ("the Complaint"). Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 7/26/2020
_____

DocuSigned by:

_____
ALISON SHERMAN